**In the Matter of VIP MOTOR LODGE, INC., Debtor.**

**Bankruptcy No. 90–611.**

United States Bankruptcy Court, D. Delaware.

Oct. 23, 1991.

James L. Patton, Jr., Janet Z. Charlton, Wilmington, Del., for debtor.

Thomas P. Preston, Daniel F. Lindley, Wilmington, Del., for The First Nat. Bank of Boston.

## MEMORANDUM OPINION AND ORDER

HELEN S. BALICK, Bankruptcy Judge.

VIP Motor Lodge, Inc. (VIP) owns and operates a Howard Johnson's Motor Lodge and restaurant in Colonie, New York, which is just outside the City of Albany. VIP filed a Chapter 11 petition on August 28, 1990. The First National Bank of Boston (Bank), the major secured creditor, objected to and voted against VIP's plan of reorganization. VIP and the Bank presented evidence in support of their respective positions. This is the court's decision on confirmation of VIP's proposed plan. Jur-

isdiction is based on 28 U.S.C. § 157(b)(2)(B) and (L).

*Background*

VIP purchased the 154 room motel, which is its principal asset, on December 1, 1987, for $4,550,000. The motel was initially a Holiday Inn but VIP acquired a franchise agreement with Howard Johnson in March of 1988. The Bank had financed VIP's purchase of the motel by loaning it $4,150,000 and, in return, obtained a promissory note, mortgage, security agreement, and other documentation securing that obligation. As of the August 28, 1990 petition date, VIP owed the Bank approximately $4,050,000 in principal, plus $438,750 in interest, $19,027.23 in late charges, and $38,455 in attorney's fees. (See Proof of Claim # 14).

After the Bank moved for relief from stay (which was denied), VIP filed a proposed plan of reorganization and disclosure statement on January 24, 1991. An amended disclosure statement was approved April 23, 1991. VIP then solicited acceptances by sending the amended disclosure statement and the amended plan to those creditors entitled to vote.

Briefly, VIP's amended plan consists of five classes. Classes 1 and 2 represent administrative and priority claims, respectively. These classes are unimpaired while subsequent classes are impaired. Class 3 represents the secured class and is divided into four subclasses, the largest claim holder being the Bank with its secured claim of $4.15 million. VIP proposes to cramdown the Bank's secured claim to the present value of the motel which VIP argues is $1.9 million (Subclass (a) of Class 3) with the unsecured portion of the Bank's claim being delegated to the unsecured class (Class 4(b) unsecured claimants). Moreover, the Bank's secured claim is to be paid back over an amortized 30–year term at 10% interest (1½% over the current prime).

Class 4 represents the unsecured class which is divided into two subclasses—one representing small trade creditors with aggregate debt totalling approximately $7,300—and the other subclass representing all other unsecured creditors. The Class 4 creditors receive 5% of their unsecured claims with the trade creditor subclass getting paid within 90 days after the effective date of the plan; the remaining creditors receive 5% of their claims within a five-year period. These monies are to be paid by the distribution of 50% from an "Excess Reserve Fund" which is to be created by cash surplus minus distributions to prior classes. VIP has the option to pay off all the unsecured debt at 5% of the claim or, if the "Excess Reserve Fund" is not adequate to make 5% payment of the claim, the creditors are to be paid on a *pro rata* basis. Finally, the VIP shareholders receive nothing monetary, but they do receive stock in the reorganized entity as Class 4(b) claimants on a share for share basis.

█ At the confirmation hearing, VIP's president, Ram Patel, testified that cash flow problems caused the bankruptcy filing and that management had developed a plan to cut overhead and "flexible" expenses. Furthermore, Patel testified that a sales and marketing plan had been developed to enable VIP to compete with the other numerous hotels/motels in the Albany area. VIP also presented appraisal testimony by John J. Mattey, an MAI appraiser, estimating the value of the motel real estate and operation at $1.9 million as of December 31, 1990. The appraisal report prepared by Mattey utilized the income approach in estimating the motel's going-concern value. Mattey employed a discounted cash flow analysis utilizing a 16% discount rate in conjunction with projected income over a period of 10 years with the reversion value factored in. The Bank rebutted the Mattey appraisal primarily with statistical evidence though it did submit an appraisal at the stay lift hearing valuing the motel at three million dollars as of November 21, 1990. Nevertheless, the court finds the Mattey appraisal credible, especially in view of the evidence that the lodging business and related real estate have reached a nadir in the present market. Accordingly, the court estimates the value of the motel as an operating business at $1.9 million for the purposes of this confirmation.

**44**

*Discussion*

The Bank voted to reject VIP's proposed plan and objected to it on several grounds, including: (1) the plan was not filed in good faith; (2) the plan violates the "absolute priority" rule of 11 U.S.C. § 1129(b)(2)(B)(ii); and (3) the plan is not "fair and equitable" to the dissenting, impaired secured class, specifically the Bank subclass, since it does not provide the Bank with the necessary protections under § 1129(b)(2)(A) of the Code (the so-called "cramdown provision"). The court will address only the above objections and finds that the debtor's plan has otherwise met all other requirements of 11 U.S.C. § 1129(a). In the end, however, the court must deny confirmation because the proposed plan's cramdown of the Bank's secured claim is not fair and equitable.

■ Turning first to the good faith objection, the Bank argues that VIP did not file its plan in good faith for various reasons such as talk of liquidation among other things. The court finds that the plan was proposed in good faith. VIP filed its plan approximately five months after filing its Chapter 11 petition and, thus, did not seek to use the bankruptcy process for dilatory purposes. Furthermore, the proposed plan appears generally to provide a fair scheme of distribution to creditors (except for the cramdown portion of the plan). VIP gave the Bank full access to its financial records and, despite some minor errors characterizing the projections as approved by VIP's accountant in the disclosure statement and speculation regarding liquidation, the debtor has in the court's view fully complied with the good faith requirements of 11 U.S.C. § 1129(a)(3).

■ As to the absolute priority rule objection, the Bank contends that the Class 5 claimants (VIP shareholders) are put ahead of the Class 4 claimants (unsecured creditors). The Class 5 claimants get a new share of common stock in the reorganized entity for each share currently held by them in VIP. In setting parameters of whether a plan is "fair and equitable" with respect to unsecured claims, the absolute priority rule holds that a Chapter 11 plan must fully compensate unsecured claimants before junior classes can be given any value in the reorganized company. Specifically, the VIP shareholders whose interests are junior to the unsecured creditors cannot receive anything until the unsecured creditor class is paid in full. 11 U.S.C. § 1129(b)(2)(B)(ii). However, the Class 5 shareholders are also Class 4(b) unsecured claimants and are apparently receiving the new stock in lieu of certain payments as Class 4(b) claimants. Furthermore, the VIP shareholders are paying off the administrative expenses and, thus, are infusing "new value" into the reorganized entity by paying off the Class 1 claims. *See, e.g., In re 222 Liberty Associates*, 108 B.R. 971, 983 (Bankr.E.D.Pa.1990) applying "new capital contributions" exception to the absolute priority rule).

■ Finally, the court turns to fair and equitable aspects of the VIP plan's cramdown of the Bank's secured claim. No § 1111(b) election has been made by the Bank. Since the Bank's claim is impaired and it has voted against the plan, paragraph (8) of § 1129(a) is not met and, therefore, the cramdown provisions under subsection (b) must be implemented. Section 1129(b)(2)(A) provides, in relevant part, the requirements of fair and equitable treatment with respect to a class of secured claims:

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such

sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A)(i)–(iii). Since the motel is not being sold under the plan, subsection (b)(2)(A)(ii) is not applicable. Here, VIP attempts to provide fair and equitable treatment to the Bank primarily through deferred cash payment amortized over a 30–year term under subsection (b)(2)(A)(i) at a 10% interest rate. Nevertheless, the length of time for which payments are deferred under the plan is simply too long. *Cf. In re D & F Construction, Inc.*, 865 F.2d 673, 676 (5th Cir.1989) (15 year deferred payment period too long); *In re 222 Liberty Associates, supra*, 993–996 (10 year deferred payment period too long). Thirty years is an extraordinarily long payout period and, though Chapter 11 has no express limitation on the length of a plan (unlike Chapter 13 which has a five-year limit), the court must find a 30–year payback term unreasonably long based upon the facts on the record.

At the confirmation hearing, the expert testimony revealed that very few bank loans are being made for hotel/motel ventures and, typically, such loans are several years long with 10 or 15 years being the longest possible commercially available. The proposed plan seeks to extend the Bank's original loan for over 25 years beyond its original term. No evidence was presented suggesting that present market conditions would permit such favorable financing terms as VIP's treatment of the Bank's secured claim, especially with respect to the length of the loan. Unlike a loan against residential property where a 30–year mortgage term is somewhat of a standard, the record shows that commercial loans secured against lodging or similar-type real estate are usually only a short term of years in length. Moreover, VIP is given a 90–day "grace" period to cure any default. The interest rate and other factors do not compensate for the extended period of deferred cash payments under this plan. Thus, the court finds that the plan does not meet the requirements of subsection (b)(2)(A)(i)(I) and (II). Similarly, the "indubitable equivalent" requirement under subsection (b)(2)(A)(iii) is not met because it does not give the full present value of the Bank's secured claim. As a result, due to the excessive length of time in repaying the Bank its $1.9 million secured claim, the court must deny confirmation because the cramdown does not treat the Bank's secured claim equitably or fairly under § 1129(b)(2)(A) of title 11, United State Code.

An Order in accordance with this Memorandum Opinion is attached. Nothing in this opinion precludes either party from filing an alternative plan or taking other appropriate action allowed under the Bankruptcy Code.