**In re MIAMI CENTER ASSOCIATES, LTD., Debtor.**

**Bankruptcy No. 91–15467–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida.

Aug. 31, 1992.

Jose A. Casal, Valdes–Fauli, Cobb, Bischoff & Kriss, P.A., Miami, Fla., for debtor.

## MEMORANDUM OPINION DENYING CONFIRMATION OF DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION

A. JAY CRISTOL, Bankruptcy Judge.

Pending before the Court is the debtor, Miami Center Associates, Ltd.'s Motion for Confirmation of its Third Amended Plan of Reorganization (the "Third Amended Plan"). Aetna Life Insurance Company ("Aetna"), the holder of a secured claim which is impaired under the Third Amended Plan, voted to reject the Third Amended Plan and filed numerous objections to confirmation.

In order for the Court to confirm the Third Amended Plan, the debtor must demonstrate that it has satisfied the requirements of § 1129 of the Bankruptcy Code. A confirmation hearing on the debtor's Third Amended Plan was conducted on July 29, 1992, at which time the debtor established to the Court's satisfaction substantial compliance with all the confirmation requirements as set forth in § 1129(a) of the Bankruptcy Code except for that contained in § 1129(a)(8) which requires acceptance of the plan by each impaired class.

Accordingly, the Court must determine whether the Third Amended Plan is "fair and equitable", and otherwise complies with § 1129(b). This Court concludes that confirmation of the Third Amended Plan must be denied because the Plan is not "fair and equitable" as to Aetna's secured claim. This opinion shall constitute the Court's findings of fact and conclusions of law. A separate order will be issued consistent with these findings and conclusions.

### I. FINDINGS OF FACT

On November 4, 1991, the debtor, Miami Center Associates, Ltd. filed its voluntary

petition for reorganization pursuant to Chapter 11. The debtor is a Florida limited partnership, which owns the 617–room Hyatt Regency Hotel in Miami, Florida (the "Hotel"). The debtor owns a leasehold interest on the real property on which the Hotel sits, pursuant to a long-term lease with the City of Miami entered into on January 24, 1978. The Hotel is managed by the Hyatt Corporation pursuant to a management agreement.

Aetna holds first and second nonrecourse mortgages on the Hotel, the debtor's leasehold interest and other personal property. According to the debtor's schedules, Aetna is owed approximately $38,106,700.63 pre-petition. Aetna filed a proof of claim in which it states that it is owed approximately $39,844,024.92 pre-petition. For purposes of this opinion, the Court does not rule on the amount of Aetna's claim since the difference in amount will not affect the outcome of the Court's ruling on feasibility.[1] On January 17, 1992, the Court valued the Hotel at $18,550,000. On July 23, 1992, Aetna elected to have the debtor treat its entire claim under the Third Amended Plan as a secured claim under § 1111(b).

This is the debtor's second attempt to confirm a plan. The Court previously denied confirmation of the debtor's Second Amended Plan of Reorganization ("Second Amended Plan") on the basis that the provisions of the Second Amended Plan unfairly discriminated against Aetna.[2] The debtor's Third Amended Plan is substantially similar to its Second Amended Plan.[3] The following classes are relevant here:

Class 1 consists of Aetna's secured claim. The Third Amended Plan proposes to pay Aetna on account of its Class 1 secured claim $18,550,000 amortized over 30 years at a cram down rate of interest, not to exceed 10%, payable over ten years with a balloon payment at the end of ten years.[4]

Class 5 consists of the non-priority unsecured claims other than Aetna's unsecured deficiency claim. These unsecured creditors, which are mainly the Hotel's trade creditors and travel agents, will be paid 10% of their claims within 30 days of the effective date, with the general partner of the debtor paying 90% of such claims within 60 days of the effective date.

Class 6 consists of the unsecured deficiency claims of Aetna and MAJD International Ltd. B.V., an insider mortgagee. The plan proposes to pay 10% of Aetna's unsecured deficiency claim as allowed under § 1111(b), with interest on the unsecured claim at a cram down market rate not to exceed 10% per annum to be determined by the Court. The plan also

---

**1.** Aetna has received $2,375,543.00 in adequate protection payments pursuant to a cash collateral stipulation approved by the Court. Aetna and the debtor agree that Aetna's total claim will be reduced in this amount.

**2.** Aetna did not make the § 1111(b) election under the Second Amended Plan. Contemporaneously with the entry of the Court's order denying confirmation of the debtor's second amended plan, the Court entered a memorandum opinion denying Aetna's motion to determine classification of claims, finding that the separate classification of Aetna's deficiency claim from the claims of general unsecured creditors was permissible and did not violate § 1122. The Court, however, denied confirmation on the grounds that the Plan unfairly discriminated against Aetna. *See In re Aztec Co.,* 107 B.R. 585, 587 (Bankr.M.D.Tenn.1989) (allowing separate classification of unsecured deficiency claim but denying confirmation where plan unfairly discriminated against undersecured creditor).

**3.** The only substantial difference between the Second Amended Plan and the final version of the Third Amended Plan (as modified) is that under the most recent Plan the debtor proposed to pay Aetna 10% of its unsecured claim, with interest at a cramdown rate over 10 years, as opposed to 5% of its unsecured claim over 10 years without interest, as provided in the earlier plan.

**4.** The original version of the debtor's Third Amended Plan reduced Aetna's allowed secured claim from $18,550,000 to approximately $16,-550,000 to account for the amount of outstanding *ad valorem* property taxes. After Aetna made the § 1111(b) election, the debtor modified the Third Amended Plan to delete this proposed reduction, thereby increasing Aetna's allowed secured claim back to $18,550,000. Aetna consented to this modification of the plan.

proposes that the debtor's limited partner will contribute MAJD's claim to the capital of the debtor.

Class 7 consists of the equity interests of the debtor. Each partner shall receive partnership interests in the reorganized debtor. The debtor's partners will invest new cash in the aggregate amount of $6,000,000, payable over three years, to refurbish the Hotel and pay administrative claims of the estate if cash from the Hotel is inadequate. The debtor's limited partner is also waiving approximately $40,000,000 in unsecured claims against the debtor.

■ Based on the testimony of Aetna's and the debtor's experts and the exhibits introduced into evidence at the hearing, the Court finds that an appropriate cramdown interest rate under § 1129(b)(2)(A)(i)(II) is 10.5% per annum. As noted above, sufficient evidence was adduced at the hearing for the Court to conclude that the Plan is feasible under § 1129(a)(10). The question becomes whether the Third Amended Plan is fair and equitable.

## II. DISCUSSION

■ The debtor has requested cram down and, therefore, in order to confirm the plan absent compliance with § 1129(a)(8), the Court must find that the plan meets the minimum requirements of a fair and equitable plan under § 1129(b)(2). *In re D & F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir.1989); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 716 (Bankr. M.D.Tenn.1992); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 511 (Bankr.S.D.Tex. 1989). The debtor must show by clear and convincing evidence that the plan is fair and equitable. *In re Tri–Growth Centre City, Ltd.*, 136 B.R. 848, 852 (Bankr. S.D.Cal.1992). The statutory requirements of § 1129(b)(2) are minimum requirements, and the Court may consider a plan not fair and equitable even though it appears to meet the statutory requirements of that section. *D & F Construction*, 865 F.2d at 675.

The Court is of the opinion that the proposed Third Amended Plan is not fair and equitable as to Aetna's secured claim because: (a) based on the evidence presented at the confirmation hearing the payment term of Aetna's secured claim over a ten year period is too long for hotel loans; (b) the plan does not provide Aetna with a lien over post-petition Hotel revenue generated during the bankruptcy case; (c) the plan violates the absolute priority rule because it does not pay Aetna its entire debt in present value terms while it does propose leaving value with equity interest holders; and (d) considering all of the circumstances involved in this case the Plan is not fair and equitable.

### A. Length of Payment Term

■ Under the terms of the Third Amended Plan, Aetna is required to wait ten years in order to be paid its secured claim. It is the Court's opinion that the length of time for which Aetna's payments are deferred is simply too long. *See In re VIP Motor Lodge, Inc.*, 133 B.R. 41, 45 (Bankr.D.Del.1991) (proposed hotel loan for thirty year term at 10% interest rate too long since few hotel loans were being made and such loans typically available only with shorter terms). *See also D & F Construction*, 865 F.2d at 676 (15 year deferred payment period too long); *In re 222 Liberty Associates*, 108 B.R. 971, 993–996 (Bankr.E.D.Pa.1990) (10 year deferred payment period too long).

At the confirmation hearing, Aetna's expert testified that few hotel loans are currently being made and, typically, such loans do not exceed four years. Although the debtor's expert testified that seven to ten years is a reasonable term for a hotel loan, the debtor's own industry surveys *on hotel loans* suggested hotel loan terms of three to four years. Although the Court has ruled that an interest rate of 10.5% is appropriate for this type of hotel loan, this factor alone does not compensate Aetna for the extended period of deferred cash payments under the Third Amended Plan. *VIP Motor Lodge*, 133 B.R. at 45.

Based on the evidence presented to the Court, the Debtor has failed to show by clear and convincing evidence that a 10

year term is fair and equitable. While the debtor has cited various cases to the Court in which longer terms have been allowed, the large bulk of these involved residential mortgages or Chapter 12 cases. Debtor has not provided the Court with any authority that a loan in its ninth year of a ten year term can be stretched out for another ten years, where the current market for similar loans (as admitted by debtor's expert) is only three to four years. Accordingly, the cram down terms proposed by the debtor do not treat Aetna's secured claim equitably or fairly under § 1129(b)(2)(A).

### B. *Post–Petition Hotel Revenue*

■ The cram down provisions of .§ 1129(b)(2)(A) require that, with respect to a secured claim, the plan must provide for the retention of that secured party's lien over the debtor's property to the extent of the allowed amount of the secured party's claim. As part of its collateral package, Aetna was granted a lien on any funds received for the use of rooms and accounts receivable of the Hotel. Aetna properly perfected its security interest in this collateral with the appropriate UCC filings.

Most bankruptcy courts have ruled that the receipts generated from the use of hotel and motel rooms are not "rents", but rather, accounts receivable. *See In re Majestic Motel Associates, Inc.,* 131 B.R. 523 (Bankr.D.Me.1991); *In re Shore Haven Motor Inn, Inc.,* 124 B.R. 617 (Bankr. S.D.Fla.1991) (interpreting Florida law).[5] Some courts have ruled that the characterization of hotel revenue as a "receivable" means that the secured party's pre-petition lien is subject to the lien "cutoff" provision of § 552(a) as to post-petition, after-acquired property. *See In re Investment Hotel Properties, Ltd.,* 109 B.R. 990, 994–95 (Bankr.D.Co.1990). The mere characterization, however, of hotel revenue as accounts receivable rather than rents does not answer whether such hotel revenue can be construed as "proceeds" or "profit" derived from the underlying hotel property,

and therefore under the exception provided in § 552(b), as opposed to revenue primarily derived from hotel services. Given the unique nature of hotel financing, the fact that the bulk of hotel revenue is generated from the use of rooms (as opposed to services), and the fact that the clear intent between Aetna and the debtor under the loan documents was to subject revenue derived from the physical use of the Hotel to a lien in favor of Aetna, the better view is that § 552(b) extends Aetna's pre-petition lien to post-petition hotel revenue. *See, e.g., In re Mid–City Hotel Associates,* 114 B.R. 634 (Bankr.D.Minn.1990) (although hotel revenue classified as rents, revenue from room rates constituted "profit" and therefore fell under § 552(b) exception). Therefore, Aetna is entitled to a lien on any post-petition revenue generated by the Hotel.

The Third Amended Plan does not address Aetna's security interest in the hotel revenue generated during the course of the bankruptcy. Thus, as Aetna is not provided with the same lien in the hotel revenue which it had prepetition, cramdown is not satisfied under § 1129(b)(2)(A)(i)(I).

### C. *Absolute Priority*

The Third Amended Plan is also not fair and equitable since it provides for the debtor's partners to retain their interests in the debtor while Aetna, as a secured creditor, is not being paid in present value terms, before the partners.

■ The debtor argues that the absolute priority rule, which precludes equity interest from surviving where senior interests have not been fully paid, is purely a creature of statute (§ 1129(b)(2)(B)(ii)), available only to unsecured creditors. This Court (as well as several others) disagrees. The absolute priority requirement is implicit in § 1129(b)(1) and (2), imposing a "fair and equitable" standard on cram down plans. "The fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured credi-

---

5. *Contra S.F. Drake Hotel Associates,* 131 B.R. 156 (Bankr.N.D.Cal.1991) (post-petition revenue generated from occupancy of hotel rooms constitute rents subject to deed of trust).

tors, rights first, those of unsecured next, and subordinating the interests of stockholders." *Lakeside Global,* 116 B.R. at 511 (citing *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 115–116, 60 S.Ct. 1, 7–8, 84 L.Ed. 110 (1939)). As was stated in *Lakeside Global:*

> Under the absolute priority rule, when the issue is cram down under § 1129(b)(2), and where the value of the estate's sole asset is going forward in the future and there is an objecting secured lender, any plan of reorganization either must pay, in present value terms, the entire debt owed to the secured lender or it has to leave nothing with junior or residual claimants, such as equity owners, whether they be partners or shareholders.

*Lakeside Global,* 116 B.R. at 511.

■ Simply put, Aetna is not receiving the indubitable equivalent of the present value of its claim since it is being required to wait ten years to realize its secured claim. The package of rights afforded to Aetna under the Third Amended Plan does not provide Aetna with any upside potential. That upside potential is going to the equity or residual claimants. *Lakeside Global,* 116 B.R. at 514. According to the debtor's own projections, the debtor will be required to pay approximately half of Aetna's total secured claim as a balloon payment ten years in the future. Given the risks associated with hotel loans in general as was testified to by both experts and the fact that the expected increase in value in the hotel will be contingent upon the completion of a substantial renovation project, it is questionable whether Aetna will receive the value of its total secured claim. It is just this sort of attempted risk shifting that the absolute priority rule was intended to prevent.

■ The Third Amended Plan provides that the debtor's limited partner will infuse $6 million over three years in new value to refurbish and renovate the Hotel. The debtor argues that the partners may exchange new value to acquire ownership control of the reorganized debtor. The Court doubts that the so-called "new value exception" survived enactment of the Bankruptcy Code. See, e.g., *Piedmont Associates v. Cigna Property & Casualty Ins.,* 132 B.R. 75 (N.D.Ga.1991); *In re Drimmel,* 135 B.R. 410, 22 B.C.D. 622 (D.Kan.1991); *In re Outlook/Century Ltd.,* 127 B.R. 650 (Bankr.N.D.Cal.1991); *In re Maropa Marine Sales Service & Storage, Inc.,* 90 B.R. 544 (Bankr.S.D.Fla. 1988). Assuming arguendo that there is a "new value exception" to absolute priority, new value must be a present contribution rather than a promise to pay in the future, it must be freely tradeable in the market by the debtor and it must be an asset in the accounting sense. *Creekside Landing,* 140 B.R. at 717; *In Re Yasparro,* 100 B.R. 91, 98 (Bankr.M.D.Fla.1989) (only current, not future, contributions considered in determining sufficiency of proposed new value).

■ New value must be reasonably equivalent to what the contributor receives in exchange. Under the Third Amended Plan, the debtor's partners are acquiring ownership in the reorganized entity by paying $2 million at confirmation. In return, the partners are retaining an interest in property with a present value of $18,550,-000. The new capital is not being used to pay Aetna's claim. Rather, it is being used to refurbish the Hotel. Although Aetna stands to benefit from the renovation work, since its collateral will presumably increase in value, it is the debtor's partners who primarily stand to gain from the capital infusion. In essence, from the debtor's perspective, the proposed new value is like putting money in the bank. The debtor's principals put the money in, and presumably the value of the hotel will increase which inure to the benefit of the debtor's principals (who may "withdraw" the increased value by selling the property in the future). In the meantime, the secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable and violates the absolute priority rule.

### D. *Other Considerations*

■ Aetna has raised a number of other concerns with the Third Amended Plan,

several of which further support the Court's conclusion that the Third Amended Plan is not fair and equitable. Aetna contends that there is no consenting, impaired non-insider class as required by § 1129(a)(10) because the Class 5 unsecured creditors are artificially impaired. Aetna argues that these creditors are only impaired by virtue of the debtor's decision to pay 90% of these claims 60 days after the Effective Date of the Third Amended Plan, notwithstanding the fact that these funds have been deposited in Debtor's counsel's trust account and are available for distribution currently. A debtor cannot artificially impair a class to satisfy the requirements of § 1129(a)(10). *In re Meadow Glen, Ltd.,* 87 B.R. 421 (Bankr. W.D.Tex.,1988).

Finally Aetna argues that notwithstanding its § 1111(b) election, the Court should examine whether the Third Amended Plan properly classified Aetna's unsecured claim and whether the Plan unfairly discriminates against Aetna as an unsecured creditor. While the Court has previously ruled against Aetna, on the classification issue for the reason articulated in the Court's July 2, 1992, Memorandum Opinion, it ruled in Aetna's favor on the issue of unfair discrimination, and the Court continues to be concerned that the Third Amended Plan also unfairly discriminated against Aetna's unsecured claim. As Aetna has made the 1111(b) election it no longer has an unsecured deficiency claim, and the Court is reluctant to deny confirmation for reasons related to the Debtor's treatment of that claim. However, the Court believes the treatment of Aetna's unsecured claim is a further contributing factor in the Court's conclusion that the plan is not fair and equitable.

For the reasons stated above, the debtor has failed to demonstrate compliance with § 1129(b) and confirmation must therefor be denied.

DONE AND ORDERED.