In re **BASELINE–DOBSON CENTER REAL ESTATE LIMITED PARTNERSHIP, Tax I.D. # 86–0443446, Debtor.**

**Bankruptcy No. 92–2170 TUC JMM.**

United States Bankruptcy Court, D. Arizona.

Dec. 19, 1994.

Michael McGrath, Mesch, Clark & Rothschild, P.C., Tucson, AZ, for Debtor.

Donald J. Newman, Newman, Ahern, Cahmbliss & Banen, Phoenix, AZ, for Berkshire Life Ins.

FINDINGS OF FACT, CONCLUSIONS OF LAW and MEMORANDUM DECISION (Dkts. 31, 34, 51, 65, 66, 200)

JAMES M. MARLAR, Bankruptcy Judge.

### PROCEDURAL HISTORY

Confirmation was first argued on June 29, 1993 before Judge Ollason. (Dkt. 123). A further hearing was rescheduled for November 10, 1993. (Dkt. 167). That hearing was continued to December 14, 1993. (Dkt. 170). On December 14, 1993, this matter was again continued on the Motion of the Court (Dkt. 186) to December 15, 1993 (Dkt. 187). The matter was continued twice more, and finally argued on February 28, 1994. (Dkts. 190, 194, 196).

Also pending is Berkshire's Motion for Stay Relief, filed on or about January 14, 1993. (Dkt. 31, 34). A Motion to Set that matter for final hearing was filed on March 15, 1994. (Dkt. 200). That motion will be disposed of by this Order.

### FACTS

The Debtor is an Arizona limited partnership. It filed Chapter 11 proceedings on July 7, 1992. At the time of filing, it owned a shopping center located at 2051 S. Dobson Road, Mesa, Arizona. Personal property included tenant leases, and approximately $1,330 in cash. Berkshire Life Insurance Company was a secured creditor. The debt was originally for $1,200,000, and was incurred August 26, 1986. The balance is now in the amount of $1,139,250. The lien is perfected. (Schedule D). The secured debt requires a payment of $11,390 per month. When this case was filed, the Debtor was delinquent for the June and July, 1992 payments. A demand letter was sent, as was a demand to the tenants, on July 13, 1992.

The strip retail shopping center is located on the Northeast intersection of Dobson and Lindner and south of the southeast corner of Baseline and Dobson Roads. It is adjacent to a large neighborhood shopping center on the corner. It is comprised of 59,196 square feet on 1.359 acres of land. The improvements encompass 16,880 square feet. The value placed upon the center is premised upon a maximum marketing time of one year. Development of the surrounding area is virtually complete. The center was built in 1982. The physical condition of the project is good, with a remaining economic life of 30–40 years. The property's highest and best use is its existing retail character. The property, at the time of filing and for 20 months thereafter, was 100% leased, with lease rates which were slightly above market. The secured creditor commissioned an appraisal from Sell, Huish & Associates, Inc. It was dated October 8, 1992. The creditor's appraiser valued the property at $670,000. (Affidavit of Jared N. Huish, and Appraisal, Dkt. 27). The Debtor's appraiser valued it at $425,000. (Affidavit of Sanders K. Solot, and Appraisal, Dkt. 26). On February 14, 1993, upon motion of the Debtor, the Court determined the value of the property to be $525,-000. (Dkt. 47).

On March 1, 1993, the secured creditor, Berkshire Life Insurance Company, filed a Creditors' Plan and Disclosure Statement. (Dkt. 48). The Debtor filed its Plan on March 8, 1993. (Dkt. 51). After amendments to the Plans, both Disclosure Statements were approved on May 24, 1993. (Dkt. 85).

The balloting of the two Plans was:

| DEBTOR'S PLAN | | | |
|---|---|---|---|
| CLASS | TYPE | IMPAIRED? | VOTE |
| 1 | Administrative | N/A | N/A |
| 2 | Taxes | Yes | None |
| 3 | Berkshire Secured | Yes | Reject |
| 4 | Berkshire Unsecured | Yes | Reject |
| 5 | Unsecured Trade | Yes | Accept |
| 6 | General Partner | Yes | Accept |
| 7 | Limited Partner | Yes | None |

(Dkt. 117)

| CREDITORS' PLAN | | | |
|---|---|---|---|
| CLASS | TYPE | IMPAIRED? | VOTE |
| 1 | Administrative | N/A | None |
| 2 | Taxes | No | None |
| 3 | Berkshire | No | None |
| 4 | First American Savings | No | None |
| 5 | Executory Contracts | N/A | None |
| 6 | Unsecured Trade | Yes | Reject |
| 7 | Limited Partners | Yes | None |
| 8 | General Partner | Yes | None |

(Dkt. 120)

Affidavits were filed regarding the appropriate market rate of interest. Mr. Doug Mueller opined that the range was 7.75%–8.25%. (Dkt. 164). The secured creditor's expert, Lief Walker, opined that a fair market rate would be 9½% per annum. Thereafter, the parties stipulated, on March 7, 1994, that the Court, using its experience, could determine a rate between 8 and 9½%. (Dkt. 195).

The income and expenses associated with the property, during the term of this case have been:

| FINANCIAL REPORT PERIOD | DKT. NO. | INCOME | EXPENSES | SURPLUS | OCCUPANCY |
|---|---|---|---|---|---|
| July 7–31, 1992 | 14 | 5,124 | 510 | 4,615 | 100% |
| August, 1992 | 16 | 13,390 | 3,476 | 9,914 | 100 |
| September, 1992 | 22 | 16,521 | 3,449 | 13,072 | 100 |
| October, 1992 | 24 | 12,337 | 3,565 | 8,771 | 100 |
| November, 1992 | 29 | 17,376 | 3,634 | 13,741 | 100 |
| December, 1992 | 33 | 14,314 | 3,828 | 10,615 | 100 |
| January, 1993 | 42 | 17,972 | 5,272 | 12,700 | 100 |
| February, 1993 | 54 | 16,797 | 3,929 | 12,868 | 100 |
| March, 1993 | 76 | 18,910 | 3,682 | 15,228 | 100 |
| April, 1993 | 84 | 15,365 | 8,381 | 6,984 | 100 |
| May, 1993 | 112 | 15,467 | 7,060 | 8,406 | 100 |
| June, 1993 | 122 | 13,963 | 3,714 | 10,249 | 100 |
| July, 1993 | 151 | 15,146 | 20,552 | ( 5,405) | 100 * |
| August, 1993 | 157 | 8,225 | 4,027 | 4,198 | 100 |
| September, 1993 | 163 | 10,663 | 4,085 | 6,578 | 100 |
| October, 1993 | 172 | 14,384 | 12,196 | 2,422 | 100 |
| November, 1993 | 185 | 12,763 | 3,969 | 8,793 | 100 |
| December, 1993 | 189 | 7,569 | 4,873 | 2,695 | 100 |
| January, 1994 | 198 | 13,561 | 3,562 | 10,258 | 100 |
| February, 1994 | 205 | 8,572 | 3,779 | 5,043 | 100 |
| March, 1994 | 207 | 14,747 | 13,735 | 1,011 | 94** |
| April, 1994 | 209 | 8,875 | 8,983 | ( 108) | 94 |
| May, 1994 | 214 | 18,357 | 7,878 | 10,478 | 94 |
| June, 1994 | 219 | 10,862 | 4,782 | 7,882 | 94 |
| July, 1994 | 220 | 7,885 | 4,727 | 3,158 | 94 |
| August, 1994 | 222 | 10,285 | 20,101 | ( 9,816) | 94 *** |
| September, 1994 | 223 | 12,200 | 10,815 | 1,385 | 94 |
| October | 224 | 10,755 | 3,909 | 6,847 | 94 |

\* $16,321 paid to secured creditor

\*\* $ 7,665 paid to secured creditor

\*\*\* Debtor's legal fees of $15,635

---

In its schedules, the Debtor listed the following creditors as unsecured trade creditors. However, "claims" for tenant security deposits are not considered for purposes of this class, since those leases are all executory contracts. *See Schedule "G."* The Debtor cannot "affect" the leases, it can only assume or reject them. § 365. Although the plan and its modifications do not discuss executory contracts, the Debtor's disclosure statement clearly indicates that the debtor will continue to operate the business of a retail shopping center, and to pay its other debt from the revenues generated therefrom. (Dkt. 52 at 12–13; Dkt. 78 at 2–3). Thus, this admission effectively constitutes a desire to assume the leases. No other party to any lease challenged the debtor on this issue. *See In re Sea Harvest,* 868 F.2d 1077 (9th

Cir.1988). (Timely assumption must be in the form of a motion). With this clarification, the only unsecured trade creditors of the enterprise are:

| CREDITOR | SERVICE | AMOUNT |
|---|---|---|
| All Sweeps Commercial | Cleaning | $ 180.00 |
| Robert Butler | Tax Appeal/Market Consulting | $3,500.00 |
| Kee Maa Corp. (Corporate general partner) | Management Company | $ 123.75 [1] |
| Gerald Kriehn | Collection Attorney | $ 150.00 (Dkt. 178 at 4) |
| Stevenson, Jones | Accounting | $ 2,850.00 |
| Sunny Mesa Landscaping | Landscaping | $ 320.77 |
| | TOTAL | $7,124.52 |

When compared to the total secured claim of $1,139,250 (Schedule "D," Dkt. 13), the unsecured debt belonging to only five unsecured creditors is but a fractional .006% (⁶⁄₁₀ of 1%) of all debts owed by the debtor.

On the date of filing, the debtor had $1,329 on hand (Schedule "B"), but had paid its Chapter 11 attorneys $26,000 as a retainer for fees and costs. That attorneys fee was paid between June 24, and July 2, 1992 (Statement of Affairs, No. 1). The bankruptcy case was filed July 7, 1992. The Debtor also closed two bank accounts on July 22, 1992.[2] (Statement of Affairs, No. 11). Those closed accounts totalled $4,262.04. The monies' whereabouts are unaccounted for.

The Debtor's Plan has provided creditors and owners with the following treatment:

| CLASS | TYPE | AMOUNT | PLAN TREATMENT | COMMENT | FIRST AMENDED PLAN | MODIFICATION TO FIRST AMENDED PLAN |
|---|---|---|---|---|---|---|
| 1 | Administrative | | Paid within 30 days after confirmation final order or in ordinary course | Not a voting class | Same | Same |
| 2 | Taxes | $ 927 | Paid in two installments. Confirmation and one-year anniversary | Impaired | Interest on deferred balances | Same |
| 3 | Berkshire Secured | 525,000 | Retain Lien. Pay all accumulated cash collateral on confirmation. 30–yr. amortization on remaining balance of approx. $475,000. Ten year balloon. Market interest. Monthly pmts. | Impaired | Same | All accumulated NOI cash collateral shall be turned over to Berkshire. There shall be no proportionate reduction of Berkshire's $525,000 claim |
| 4 | Berkshire Unsecured | 614,250 | Paid 10%, or $61,425 in 10 annual installments | Impaired | Same | Same |

1. Kee Maa is also the corporate general partner of the Debtor.

2. Unless this was a typographical error, these were unauthorized post-petition withdrawals.

These sums were not accounted for in the first financial report. (Dkt. 14), which showed a beginning cash balance of $1,193.24.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | at 8% interest. First payment on confirmation | | | |
| 5 | Trade Unsecured | 7,124 | 50% on confirmation and 50% on one-year anniversary. 90% of the 100% payment will be made by the general partner. | Impaired | Same | Same |
| 6 | General Partner | N/A | Pay $11,000 to Debtor on Confirmation, plus 90% to unsecured creditors | | In addition, Bassett will contribute $250 per month received while case in Chap. 11 | Same |
| 7 | Limited Partners | N/A | Contribute $120,000 in three equal installments. First installment on confirmation. Next installments on 1st & 2nd anniversaries | | Same | Same |

(Dkt. 51, 52, Plan of March 8, 1993; Dkt. 78, 1st Amended Plan of April 22, 1994; Dkt. 175, Modification to 1st Amended Plan)

---

Berkshire did not elect to be treated as fully secured under 11 *U.S.C.* § 1111(b)(2), so provisions of the plan related to that treatment have not been set forth above.

## LEGAL DISCUSSION

The parties have raised numerous legal issues concerning the confirmability of the debtor's Plan. They will be discussed in order.

1. *Interest rate*—The parties have stipulated that the Court may determine the interest rate, and has provided the opinions of two experts on this subject. The Court finds that a fair market rate of interest, at the time of the hearing on confirmation on February 28, 1994, was 8.75%.

2. *Cash collateral Issues*—Since the debtor's plan will pay all accumulated cash collateral to the creditor, the debate over this issue is now moot.

3. *Impaired consenting class*—The creditor has argued that the debtor does not have an impaired consenting class. However, there are sufficient votes in the unsecured class, favoring the plan, resulting in an acceptance by that unsecured creditor class. Thus, this condition of the Code, § 1129(a)(10) has been satisfied. Whether the classification of creditors is appropriate, in light of the considerations set forth below, is a separate issue. However, on its face, the ballots reflect an impaired consenting class. If reclassification is required, however, there will not be an impaired consenting class.

4. *New value and The Absolute Priority Rule*—the debtor maintains that its Plan provides appropriate "new value" to overcome the absolute priority rule. The value will be paid in three installments, of approximately $40,000 each, the first installment being made at confirmation. The installments will be used to meet required and anticipated maintenance and tenant improvements over the next two years. In addition, the debtor's general partner will return $11,000, as well as an amount equal to $250 per month received during the Chapter 11 proceeding. The contribution must be necessary, substantial, equivalent or in excess of the interest retained, and be money or monies' worth. It is also acceptable if the contribution is made over time, in the future, from the earnings of the partnership. *In re Johnston,* 21 F.3d 323 (9th Cir.1994). The new value exception has been recognized in the Ninth Circuit. *In re Bonner Mall Partnership,* 2 F.3d 899 (9th Cir.1993); *See also Case v. Los Angeles Lumber Company,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

The first consideration in evaluating the adequacy of the new value contribution is to ascertain whether the plan is feasible. The re-amortized secured obligation or $525,000, at 8.75% will require monthly payments of approximately $4,132 per month. The Chapter 11 history of the debtor (adding back the attorneys fees' and lump sum secured creditor payments which will not recur if confirmation is approved) reflect that the debtor will have an average net operating income (NOI) of approximately $8,483 per month. The reamortized obligation will allow the payment, and the plan is feasible for the ten-year term. By the end of that period, the principal will be reduced and if real estate values cycle upward once more, the property will be worth more than the secured portion of the debt, allowing refinancing, sale or interest a new capital infusion.

In addition, the excess NOI will allow for payment of the unsecured trade debt and the 10% deficiency payment of $61,425, or $6,142 annually or $512 per month. Moreover, the contribution will keep the property maintained and tenants in place. To the extent that the capital contribution allegedly only "shifts the risk" to the secured creditor, this Court rejects the reasoning of the Bankruptcy Court of Florida in *In re Miami Center*, 144 B.R. 937 (Bankr.S.D.Fla.1992). Contributing *necessary* improvements to a secured property enhances or retains value *equally* to owners and the secured creditor. No risk is shifted thereby—the *status quo* is favorably retained to the mutual benefit of owner and lienholder. Since the Ninth Circuit, in *Johnston*, approved future contributions as satisfying the absolute priority rule, this Court finds no disservice paid to the rule in using those future contributions to maintain the secured premises.

Thus, the debtor has satisfied the absolute priority rule requirement of 11 *U.S.C.* § 1129(b)(2)(B)(ii), as it applies to the Berkshire deficiency claim.

### 5. *Separate classification, Artificial Impairment and Bad Faith*—The creditor has argued that it is improper for the debtor to have classified the unsecured portion of its claim separately from the other unsecured creditors. Moreover, the creditor argues that had the debtor classified the unsecured deficiency claim with the unsecured creditor group, the undersecured Berkshire's rejecting vote would have dominated the voting in the class, by dollar amount, and would have resulted in the debtor being left without an impaired consenting class. The debtor argues that the classification is appropriate, that there are legitimate reasons to place the deficiency claim of the secured creditor in a separate class, and to treat it separately for payment. A corollary of the issue is whether the debtor has met the "new value exception," sufficient to pay an unsecured claim less than by full payment, by making a substantial and necessary contribution as required by law. That issue was discussed above.

The sin of separate classification and separate treatment of an obviously belligerent creditor is that it results in what has become known, in transmutation from a legislative tactic to a term of legal parlance, as "gerrymandering." [3] Thus, the legal technique of gerrymandering, for purposes of § 1129(a)(10), simply means the reconfiguration of creditor classes to suit the dynamics of current Chapter 11 law requiring an impaired consenting class.

The Code, relative to classification, provides the following guidance. Section 1122(a) states, that except for the administrative convenience class,

> ... a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

Thus, it is appropriate to separately classify different types of claims provided such classification is not unfairly discriminatory. § 1129(b)(2). The Ninth Circuit Court of Appeals has held that such classification is permitted if (1) the claims are substantially similar, and (2) there are good business rea-

---

**3.** The term "gerrymandering" was first used in 1812, with reference to the tactics employed by Governor Elbridge Gerry, of Massachusetts, whose shameless technique of changing voting boundaries to suit the demographic dynamics favorable to his party resulted in political districts that sometimes resembled salamanders. Hence, the name "gerrymander." It implies improper and unfair manipulation of the letter of the law.

sons to support the different classification and/or treatment. *In re Johnston*, 21 F.3d 323 (9th Cir.1994).

The Ninth Circuit has held that the question of whether claims are "substantially similar" within the meaning of § 1122(a) is a question of fact, reviewable under the clearly erroneous standard. *In re Johnston, supra.* In such context, the reasons for different treatment and separate classification must be closely scrutinized. *In re Acequia*, 787 F.2d 1352, 1364 (9th Cir.1986).

The Debtor has argued that the continued need for the services of the landscaper ($320.77) and the cleaning crew ($180.00) mandate their full payment, thereby justifying placement of the $614,250 Berkshire deficiency in a different class, with only 10% treatment. Also argued is the fact that, absent bankruptcy, the Berkshire deficiency is non-recourse. The Bankruptcy Appellate Panel of the Ninth Circuit has provided judicial guidance in connection with resolving this factual issue. Factors to consider are:

(1) is the discrimination reasonably based?;

(2) can the debtor reorganize without it?;

(3) is the discrimination fair and proposed in good faith, or is it only necessary to create an impaired consenting class?; and

(4) is the degree of discrimination directly related to the rationale for the disparate treatment?

*In re Wolff*, 22 B.R. 510, 512 (9th Cir. BAP 1982) (Chapter 13). This rationale articulates the logic behind the Ninth Circuit's *Johnston* decision.

First, with respect to the non-recourse argument, this argument is rejected. If the debtor wishes to allow foreclosure, then non-recourse becomes important. But here, the debtor proposes to retain the secured property, prevent foreclosure, and only pay ten percent of the established unsecured debt, over time. Thus, by keeping the property, the debtor has waived the protection of negotiated non-recourse debt. Therefore, the "deficiency," or more correctly, the undersecured portion, must be paid. If the debtor wishes to allow foreclosure, bid the current market value of the property, avoid deficiency liability, it must allow market forces to operate.

In analyzing the makeup of the other unsecured creditors, it is clear that Kee Maa Corp. is an insider. Its services are not "essential" to the debtor's operation. Moreover, it is only owed $123.75. The collection attorney, Gerald Kriehn, is owed $150.00; his continued services are not critical to the debtor's operation. The accountant and tax appeal specialist are not critical components of the success of the venture. Finally, neither the landscaper nor the cleaner's services are so necessary that the venture will fail if substitute companies are employed.

The amounts of the debts owed to the unsecured trade creditors are minor compared to the Berkshire secured/undersecured claim. That creditor has, by far, the largest stake in the outcome of this case. In effect, the "trade class" was apparently not paid in order to create a consenting "class." They could easily have been paid if the Chapter 11 attorneys were not paid the $26,000 retainer, or if the debtor's principals had not received the $11,000 preference which they now propose to return as part of the new value contribution. A large portion of that trade debt could also have been paid from the closed $4,262.04 bank accounts, which were depleted and unaccounted for post-petition.

In short, both the facts and the law require a finding that reasons espoused by the debtor do not justify separate classification and separate treatment of the Berkshire deficiency from the trade debt. The attempt to separately classify violate § 1122(a) and the "fair and equitable" requirement of § 1129(b)(2) and is, in reality, an improper effort to manipulate the Code and engineer an arbitrarily-created impaired class solely for convenience of satisfying the cramdown requirements. Such treatment and separate classification is rejected. *See, also In re Windsor on the River Associates, Ltd.*, 7 F.3d 127 (8th Cir.1993); *In re Boston Post Road Limited Partnership*, 21 F.3d 477 (2d Cir.1994); *In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir.1991); *John Hancock Ins. Co. v. Route 37 Business Park Assoc.*, 987 F.2d 154 (3rd Cir.1993); *In re Bryson Properties, XVIII*, 961 F.2d 496 (4th Cir.1992), *cert. denied*, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *contra*

*Matter of Woodbrook Assoc.,* 19 F.3d 312 (7th Cir.1994).

 Finally, the Court must address "good faith" in the context of classification and unfair discrimination. The reality of this case is that it is only a two-party dispute. Impairment, being engineered, is by definition somewhat "artificial." Since the code does not split hairs on the degree of impairment, it is, more properly, a good faith issue. Being only a two-party dispute, the Berkshire debt should be modified outside of the bankruptcy process. *In re Landmark Capital,* 27 B.R. 273 (Bankr.D.Ariz.1983);

For those reasons, the Court finds that the classification described for the undersecured creditor's claim is improper, and but for such classification, the debtor would be unable to present an impaired consenting class voting in favor of its plan.

### CONCLUSION

The Plan fails to satisfy §§ 1129(a)(1), (3), (8), and (10).

### RULING

IT IS ORDERED that:

1. Confirmation of the Debtor's Plan is denied. Berkshire's counsel should present a separate order on such issue within 15 days.

2. A final hearing on Creditor Berkshire's Plan and Motion for Stay Relief is set for **Tuesday, January 24, 1995 at 11:00 o'clock a.m.**