In re MONARCH BEACH VENTURE, LTD., Debtor.

AETNA REALTY INVESTORS, INC., Appellant,

v.

MONARCH BEACH VENTURE, LTD., Appellee.

No. SACV 93–934–GLT.
Bankruptcy No. SA 92–17591–JB.

United States District Court, C.D. California.

Nov. 16, 1993.

Marc J. Winthrop and Sean A. O'Keefe, Lobel, Winthrop and Broker, Irvine, CA, for Monarch Beach Venture, Ltd.

Richard Casher and G. Eric Brunstad, Jr., Hebb & Gitlin, Hartford CT, and Dennis Arnold and Kathryn L. Koorenny of Gibson, Dunn & Crutcher, Irvine, CA, for Aetna Realty Investors, Inc.

## ORDER ON APPEAL

TAYLOR, District Judge.

This case raises the issue, largely undefined in the Ninth Circuit, of legal standards applicable for evaluating a "cram down" plan under 11 U.S.C. Section 1129(b). The court reviews those standards, and REMANDS the case for further findings.

## I. BACKGROUND

Aetna Realty Investors, holder of a $31 million secured claim against Debtor Monarch Beach Venture, Ltd., seeks reversal of the bankruptcy court's order confirming the Debtor's plan of reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Aetna contends the bankruptcy court erred as matter of law in confirming the plan over Aetna's objections. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a).

Debtor is a "single asset" limited partnership. Its sole asset (in addition to cash) is a 325–unit apartment project located in Dana Point, California. The Debtor also holds approximately $1.6 million in a bank account, which comprises the project's net operating income from rent as of May 31, 1993. Aetna holds a perfected lien on the rent proceeds.

The Project is subject to four liens, of which Aetna's is the largest and the second most senior. The liens are: the County of Orange's first lien for $230,000 in unpaid property taxes; Aetna's second lien in excess of $31 million due October 1, 1993, secured by first-priority and second-priority deeds of trust;[1] a $75,000 third lien for overdue homeowners association dues; and a fourth $2.6 million lien held by Continental Bank, N.A. secured by a third-priority deed of trust guarantied by two of the Debtor's general partners.[2]

---

**1.** At trial, Aetna testified that it had not been paid for 11 months, despite the fact that the Debtor continued to collect rent proceeds.

**2.** Continental appeared in the bankruptcy court and this court. Aetna objects to Continental's appearance before this court on the ground that it lacks standing. 11 U.S.C. section 1109(b) pro-

Additionally, the Debtor owes unsecured creditors approximately $1.7 million, most owed to the partnership's insiders.

Under the plan, the Debtor seeks to convert the project from rental apartments to condominium units, and use the net sales proceeds to pay all claims in full with interest within thirty-six months. The "Net Proceeds" from the sale of each unit—defined as sales price less costs of sale and 5 percent allocation to an ongoing Operating Reserve Account—will be deposited into a segregated interest bearing account, and thereafter be distributed to the various claim-holders. Aetna is to receive 90 percent of the Net Proceeds until the claims of Orange County and the homeowner's association are paid, after which the ten percent formerly allocated to those claimants will be reallocated to Aetna. Once a unit is sold, Aetna will lose its lien on that unit. Aetna will retain a lien on the funds in the Operating Reserve Account, but not on the segregated interest bearing account.

Aetna argues that (1) the Debtor failed to demonstrate by clear and convincing evidence that the Plan satisfied the relevant statutory requirements, (2) the Plan denies Aetna statutorily-required rights, such as the right to credit bid and to absolute priority of its claim, (3) the Plan imposes undue risk on Aetna, and (4) the plan discriminates unfairly against Aetna in light of the more favorable treatment afforded junior creditors.

## II. DISCUSSION

The issue presented on this appeal is whether the bankruptcy court applied the correct legal standard in confirming the Debtor's plan of reorganization. This is a question of law. Questions of fact will not be reversed on appeal unless found to be clearly erroneous, but questions of law are reviewable de novo. *Woods v. Pine Mountain, Ltd.,* 80 B.R. 171, 172 (9th Cir. BAP 1987); *Aceq-*

---

vides "a party in interest, including ... a creditor, may raise and may appear and be heard on any issue in a case under this chapter." The court holds that Continental is a party in interest who will be directly and adversely affected by any reversal of the approved plan, and thereby has standing in this appeal.

*uia, Inc. v. Clinton,* 787 F.2d 1352 (9th Cir. 1986); *See also* Fed.R.Bankr.Proc. 8013.

11 U.S.C. § 1129(b) governs the confirmation of nonconsensual Chapter 11 reorganizations over the objection of a creditor. It is colloquially known as "cram-down" because it affords the judge the power to force modifications down the throat of an unwilling creditor. *See* Jack Friedman, "What Courts do to Secured Creditors in Chapter 11 Cramdown," 14 Cardozo L.Rev. 1495, 1496 n. 1, (*citing In re Norris,* 1 B.R. 724, 725 n. 1 (Bankr.E.D.Va.1979)).[3]

### 1. *The "Cram–Down" Requirements of Section 1129(b).*

The body of developing law on this topic has outlined a series of proof requirements for validation of a "cram-down" plan.

#### a. *The statutory framework*

11 U.S.C. § 1129 states the requirements for confirming a Chapter 11 reorganization plan. 1129(a) states, in relevant part,

**(a)** The court shall confirm a plan only if all of the following requirements are met:

... **(7)** With respect to each *impaired class* of claims or interests—

**(A)** each holder of a claim or interest of such class—

**(i)** has accepted the plan; or

**(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is *not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date....* (emphasis added)

**(8)** With respect to each class of claims or interests—

**(A)** such class has accepted the plan; or

**(B)** such class is not impaired under the plan.

Under the statute, a plan may be confirmed over the objections of a creditor, if certain conditions are met. Section 1129(b) provides:

**(b)** (1) ... if all of the applicable requirements of subsection (a) of this subsection other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan *does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

**(2)** ... the condition that a plan be *fair and equitable* with respect to a class includes the following requirements:

**(A)** With respect to a class of secured claims, the plan provides—

**(i)(I)** that the holders of such claims *retain the liens securing such claims,* whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

**(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of *at least the value of such holder's interest in the estate's interest in such property;*

**(ii)** for the sale ... of any property that is subject to the liens securing such claims ... or

**(iii)** for the realization by such holders of the *indubitable equivalent* of such claims (emphasis added throughout).

#### b. *Standard of proof*

■ According to Appellant, Debtor was required to prove by "clear and convincing evidence" that the Plan met the standards of section 1129(b). Debtor, in contrast, argues

---

**3.** This article is unique and authoritative. It analyzes every decision (up to January 1993) in which a plan of reorganization was crammed down on a secured creditor under the current Bankruptcy Code—a total of 175 cases. In addition, the author reviewed approximately 1500 reported decisions related to cram down since its enactment by statute in the 1930's, in order to give a sound foundation to its analysis. Friedman at 1498.

its burden was only to make a "preponderance of the evidence" showing.[4]

Case law from various district courts strongly supports the view that the standard of proof for the debtor is "clear and convincing."[5] *See* Jack Friedman, "What Courts do to Secured Creditors in Chapter 11 Cramdown," 14 Cardozo L.Rev. at 1501, n. 18. There is no Ninth Circuit case on point.

However, in apparently the first Court of Appeals ruling on the point, a recent 5th Circuit decision bucks the trend, holding a debtor need establish fairness of a "cramdown" plan only by a preponderance of the evidence. *Heartland Federal Savings & Loan Assn. v. Briscoe Enterprises, Ltd.*, 994 F.2d 1160 (5th Cir.1993). While the court acknowledged that "a number of bankruptcy courts have used the clear and convincing standard," it stated that "in none of these cases have we found a satisfactory explanation why that is the appropriate standard." *Id.* at 1164. The *Briscoe* court relied on *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), where the Supreme Court held the preponderance standard applied to all exceptions from dischargeability of debts under § 523(a) of the Bankruptcy Code, including the non-dischargeability for fraud provision. The Court further opined that "The preponderance standard is presumed to be applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake." *Id.* at 655, 111 S.Ct. at 279.

Section 1129(b) is similar to § 523(a) in that the legislative history for both are silent as to the standard of proof to be used, a silence which the *Grogan* court found "inconsistent with the view that Congress intended to require a special, heightened standard of proof." *Id.* at 659, 111 S.Ct. at 286. *Briscoe* declined to restrict *Grogan* to dischargeability situations:

> Considering the other precedents and the process of the *Grogan* Court, we find this to be too narrow a reading of *Grogan* ... This case is solely about money. There are not even any quasi-liberty interests at stake. It is correct, of course, as Justice Brandeis noted during the depression ... that the Bankruptcy laws are subject to the Takings clause [citation omitted]. The Code, however, has been the primary source of the creditors' protections not the Fifth Amendment. Congress provides protection for creditors, and in many instances it allows debtors to impinge on creditor's state law rights ... The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cram-down.

*Briscoe* at 1165.

This court is persuaded by *Briscoe's* reasoning. Although the priority lien right involved here is an important property right, it is a money interest similar to other interests adjudicated by courts under the "preponderance" standard. The appropriate standard in this case is proof by a preponderance of the evidence.

---

4. At the hearing, Judge Barr indicated that he did not put much weight in the distinction between the two proposed standards. In addressing Aetna's argument, he stated:

> ... [I] don't have any Ninth Circuit law that compels me to apply the clear and convincing evidence standard. But I don't know that that's terribly crucial here ... to the extent that ... if the Debtor hasn't satisfied me that ... the risk to Aetna has been compensated for, the plan just won't be confirmed. And ... if it's preponderance of the evidence, or clear and convincing, quite frankly, the Appellate Court's going to have to deal with that, because ... my standard is that I must be convinced. And ... this clear and convincing standard, I suppose, is in the eye of the behold-

er ... and I don't know where that line is to be drawn. (App.Ex. 15 at 273).

5. *See, e.g., Imperial Bank v. Tri–Growth Centre City, Ltd.*, 136 B.R. 848, 851 (Bankr.S.D.Cal. 1992) (holding that, in case on impaired dissenting creditor, debtor must show by a clear and convincing burden of proof at confirmation that the plan did not unfairly discriminate and was fair and equitable with respect to that creditor); *In re Miami Ctr. Assocs., Ltd.*, 144 B.R. 937, 940 (Bankr.S.D.Fla.1992); *NCBN Texas Nat'l Bank v. Hulen Park Place Ltd.*, 130 B.R. 39, 42 (N.D.Tex. 1991); *In re Future Energy Corp.*, 83 B.R. 470, 481 (Bankr.S.D.Ohio 1988); *In re Agawam Creative Mktg. Assocs.*, 63 B.R. 612, 618–19 (Bankr. D.Mass.1986).

### c. "Fair and equitable": The Explicit Requirements

The statute allows fulfillment of the fair and equitable requirement in one of three ways.

First, 1129(b)(2)(A)(i), requires that the creditor retain the liens securing the claim, and receive deferred cash payments. This alternative is inapplicable here because Aetna does not retain a lien on the entire property until the debt is paid off, but rather loses the lien on each unit after that unit is sold, and also does not retain a lien on the entire proceeds of the sale of each unit.

■ The second alternative, 1129(b)(2)(A)(ii), allows the sale of collateral free and clear of the creditor's lien, and is essentially a means of converting secured property into cash collateral. Under this alternative, the debtor may either pay the proceeds of a sale of collateral to the creditor or retain the proceeds subject to a lien, with the proceeds or their equivalent being distributed in some manner to the creditor.

Aetna contends that subsection (ii) requires that the creditor be allowed to "credit bid," under Section 363(k), which permits a creditor to bid the entire amount of its claim at a sale of the debtor's collateral, and, if the creditor purchases the collateral, to offset its claim against the purchase price of the property. Debtor argues that, despite the reference in subsection (ii) to section 363(k), credit-bidding is not a mandatory requirement because the language of 363(k) itself is discretionary.[6]

Notwithstanding the discretionary language of 363(k), each of the six decisions that has addressed this issue has held that the secured creditor had a right to credit bid his entire claim.[7] See Friedman at 1530. Most persuasive, in *John Hancock Mutual Life Insurance Co. v. California Hancock, Inc.,* 88 B.R. 226 (9th Cir. BAP 1988), the Ninth Circuit Bankruptcy Appellate Panel upheld a bankruptcy court's rejection of a reorganization plan that did not permit a "non-recourse" creditor the right to credit bid. While the court noted "[t]he language of § 363(k) is unclear as to whether the right to credit bid is applicable when the property is being sold pursuant to a reorganization plan," nevertheless it held legislative history supported the creditor's right to bid at a sale of property pursuant to a reorganization plan. *Id.* at 230–231. Thus, at least in this Circuit, the right to credit bid may not be taken from the creditor. Since Aetna was not given the right to credit bid, the Debtor's plan cannot qualify as "fair and equitable" under that alternative.

■ The third alternative, 1129(b)(2)(A)(iii), permits confirmation over a creditor's objection if the creditor will receive the "indubitable equivalent" of its claim. It has been observed about this alternative, the most vague and potentially far-reaching of the three, Friedman at 1532, that "more has been written on indubitable equivalence with less effect than on almost any other area of bankruptcy law." Friedman at 1532, *quoting* Richard F. Broude, Reorganizations Under Chapter 11 of the Bankruptcy Code 13–23 (1986).

The phrase itself was coined by Judge Learned Hand in *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir.1935). In rejecting a plan, Judge Hand stated:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally

---

6. 363(k) states, in relevant part,
   At a sale … of property that is subject to a lien that secures an allowed claim, … the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

7. *See John Hancock Mutual Life Ins. Co. v. California Hancock, Inc.,* 88 B.R. 226, 230–231 (Bankr. 9th Cir.1988); *In re H & M Parmely Farms v. Farmers Home Admin.,* 127 B.R. 644, 648 (Bankr.D.S.D.1990); *In re 222 Liberty As-*socs., 108 B.R. 971, 979 (Bankr.E.D.Pa.1990); *In re Realty Invs., Ltd. V,* 72 B.R. 143, 146 (Bankr. C.D.Cal.1987); *In re Woodridge N. Apartments, Ltd.,* 71 B.R. 189, 191–92 (Bankr.N.D.Cal.1987); *In re Yagow,* 60 B.R. 543, 547 (Bankr.D.N.D. 1986). *See also In the Matter of Martindale,* 125 B.R. 32, 37 n. 4 (Bankr.D.Idaho 1991) (holding that a plan that does not permit credit bidding cannot be approved under clause (ii), but might be approved under clause (iii)). *See* Friedman at 1531 n. 162.

the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principle will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Id.* at 942.

Paraphrasing Judge Hand's words, the Ninth Circuit in *In re Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984) stated,

Judge Hand concluded that the creditor's right "to get his money or at least the property" may be denied under a plan for reorganization only if the debtor provides 'a substitute of the most indubitable equivalence.' Such a substitute clearly must both compensate for present value and insure the safety of the principal (emphasis added).

*Id.* at 433.

*Woods v. Pine Mountain Ltd.,* 80 Bankr. 171 (9th Cir. BAP 1987), is not inconsistent with this rule, and does not stand for the proposition that "indubitable equivalence" is satisfied merely by showing the plan is "feasible." The *Pine Mountain* court used that word only to describe the facts of that case where the creditor was extremely well protected, and the plan was not speculative. The case does not refer to the earlier *In re Mariner,* or purport to overrule it. In fact, *Pine Mountain* acknowledges Judge Hand's standard as the correct one, but rejects the creditor's contention that it was not applied in that case:

The record belies [creditor's] argument. The trial court specifically found, after assessing the credibility of witnesses for both parties, that the ... plan was feasible. Thus, the plan is not "wholly speculative". In addition, because of the ... nature of the development, it is unlikely that the Woods' claim would ever become even partially unsecured. Currently, the Woods' claim is for approximately $275,000. The property is valued at $1,200,000. Therefore, even after an $820,000 construction loan is obtained, the Woods would still be

fully secured. Moreover ... it is likely that the value of the property will ... increase.

*Pine Mountain* at 174–175.

The two cases in this Circuit do not conflict. They must be read together in support of a stringent "indubitable equivalent" standard that (1) provides the creditor with the present value of its claim, and (2) insures the safety of its principle. The Legislative choice of the phrase itself unambiguously incorporates the strict approach stated by Judge Hand. Friedman at 1532 n. 166.

### d. *Implicit requirements of "fair and equitable"*

Some courts conclude that, in addition to the explicit requirements of the "fair and equitable" standard, there are further implicit requirements. These courts hold Section 1129(b)(2) sets out only minimal standards a plan must meet, and does not require that every plan not prohibited be approved. *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank,* 881 F.2d 1346, 1352 (5th Cir.1989). By its language, Section 1129(b)'s requirements are not exclusive. Therefore, the court concluded that, depending on the facts of a given case, other implicit requirements may have to be met for a plan to be "fair and equitable."

Aetna argues that a debtor must comply with two "implicit" requirements: (1) that a senior creditor receive 100 percent of its claim before a junior creditor receives any payments, and (2) that a plan not impose an unreasonable risk of its failure on the secured creditor.

### *Absolute Priority Rule*

As explained in the Friedman article, under the Act preceding the current Bankruptcy Code, the Supreme Court held that "fair and equitable" was a special term of art applying an absolute priority rule. Friedman at 1505. In the current Code, the absolute priority rule is explicitly applied to *unsecured* claims and equity interests, but is not mentioned in relation to *secured* claims. Few decisions under the Code specifically consider whether the rule still applies to secured creditors. *Id.* In addition, Fried-

man found no decision under the Code that directly considers whether junior creditors could be prevented from receiving any payments until a senior lien is paid in full. *Id.* at 1506 n. 46.

In one case, *In re Elijah*, 41 B.R. 348 (Bankr.W.D.Mo.1984), the court held a plan proposing that a creditor's first lien be substituted with a junior lien on other collateral violated the absolute priority rule because it subordinated the senior creditor to junior creditors. According to that court,

> Section 1129(b)(2) defines fair and equitable as to a class of secured claims as requiring inter alia "that the holders of such claims retain the lien securing such claims, whether the property subject to such lien is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims ...". The legislative history states that the test is a codification of the absolute priority rule.

*Id.* at 352. *In re Elijah* thus indicates at least one court's opinion that subsection (i) of 1129(b)(2)(A) contains the absolute priority requirement.

Another case, *In re Miami Center Associates, Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992), went further, holding that absolute priority is an implicit requirement of 1129(b) and not just of an individual subsection. In that case Aetna held a secured claim in excess of $38 million. In its reorganization plan, the debtor sought to defer Aetna's repayment for ten years, while the debtor's partners retained their interests in the debtor. The court held that such a plan was not fair and equitable and violated the absolute priority rule. In answering the debtor's contention that the absolute priority rule was inapplicable, that court stated,

> The debtor argues that the absolute priority rule, which precludes equity interest from surviving where senior interests have not been fully paid, is purely a creature of statute ... available only to unsecured creditors. This Court (as well as several others) disagrees. The absolute priority requirement is implicit in § 1129(b)(1) and

(2), imposing a "fair and equitable" standard on cram-down plans.

*Id.* at 941.

*Miami Center* cited as support *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 511–12 (Bankr.S.D.Tex.1989), which had held,

> [T]he fair and equitable requirement provides for an absolute rule of priority among creditors and stockholders in reorganization plans, placing secured creditors' rights first, those of unsecured next, and subordinating the interests of stockholders. *(citing Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 115, 60 S.Ct. 1, 7, 84 L.Ed. 110 (1939)).

The legislative language supports these courts' conclusions. According to a Report accompanying the legislation,

> The general principle of the subsection [1129(b)] permits confirmation notwithstanding nonacceptance by an impaired class if that class and all below it in priority are treated according to the absolute priority rule. The dissenting class must be paid in full before any junior class may share under the plan ... Treatment of classes of secured creditors is slightly different because they do not fall in the priority ladder, *but the principle is the same* (emphasis added).

Report of the Comm. on the Judiciary, United States House of Representatives, to Accompany H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977), quoted by Friedman at 1505, n. 45.

In support of its contention that the absolute priority rule merely requires that a plan provide for the full payment of senior claims in order for junior creditors to participate, Debtor cites *In the Matter of James Wilson Associates*, 965 F.2d 160 (7th Cir.1992); and *Prudential Ins. Co. of America v. Monnier*, 755 F.2d 1336 (8th Cir.1985). However, *Monnier* did not discuss the absolute priority rule, but rather addressed other components of 1129(b). *Wilson* did hold that the absolute priority rule was not violated when the creditor would be paid in full with interest, despite the fact that junior creditors would also be paid. However, the *Wilson* court recognized the absolute priority rule, and was

influenced by the extremely secure position that the objecting creditor held, and by the fact the creditor did not claim it was endangered.

> [The creditor] has every right to complain if the trustee or debtor in possession monkeys with the security *in a way that endangers its claim,* but [creditor] does not argue that its claim is endangered by any of the steps of which it so bitterly complains. There is no unconstitutional taking of a security interest that is far in excess of the claim secured by it, if, after the taking, the creditor remains adequately protected, here by another security interest ... *The absolute-priority rule is not violated, because the plan provides for [creditor] to be paid in full with interest* (emphasis added).

*Id.* at 171. In contrast to *Wilson,* Aetna does argue that its claim will be impaired by the proposed payments to junior creditors.

The developing case law and legislative history persuade this court that absolute priority *is* an implicit part of the "fair and equitable" formula: the dissenting secured creditor must ordinarily be paid in full before any junior class may share under the plan. It would be necessary for the bankruptcy court to articulate and evaluate by findings and conclusions any good and sufficient reasons why that standard has been met, or unusual and extraordinary reasons that justify departure from that standard.

*Unfair Risk Shifting*

■ Aetna contends a second implicit requirement was not met: prevention of the plan from imposing an unreasonable risk of its failure on the secured creditor.

Several bankruptcy court cases support the existence of this requirement. For example, in *In re Consul Restaurant Corporation,* 146 B.R. 979 (Bankr.D.Minn.1992), the court rejected a plan that would have distributed cash to a subordinated class while the senior subordinating class remained unpaid. The court stated:

> The concept of fair and equitable involves more than an application of a mechanical calculation of absolute priority based on distribution of property valued abstractly.

> When the proposed distribution would substantially shift the risk of failure of the plan from a junior class to a senior dissenting class for no legitimate purpose, the plan is not fair and equitable to the dissenting class.

*Id.* at 979. See *also In re Miami Center Associates, Ltd.,* 144 B.R. 937, 942 (Bankr. S.D.Fla.1992); *In re EFH Grove Tower Associates,* 105 B.R. 310, 314–315 (Bankr. E.D.N.C.1989) (rejecting debtor's plan for imposing too much risk on the creditor, and stating that the "debtor would have presented a stronger case if it had been willing to assume more of the risk"); *In re Vernon McCarty,* 69 B.R. 377, 378 (Bankr.M.D.Fla. 1987) (finding that creditor was entitled to the benefit of its bargain and could not be forced to finance the debtor's plan of reorganization).

Friedman describes the unfair risk shifting analysis as a common approach in the courts:

> Based on an analysis of over fifty years of case law, this author has discerned the following ... [implicit] requirement: Fair and equitable as it applies to secured claims requires not only the satisfaction of one of the explicit requirements of clauses (i), (ii), or (iii), but also that the technical fulfillment of these three clauses should not impose an unreasonable risk of the plan's failure on the secured creditor.

Friedman at 1506–1507.

Debtor here does not present cases rebutting Aetna's unfair risk argument.

Apparently no cases in this circuit have previously addressed the existence of the implicit "risk shifting" aspect to the "fair and equitable" requirement. This Court holds that, to be fair and equitable, a plan of reorganization cannot unfairly shift the risk of a plan's failure to the creditor. The bankruptcy court must make specific findings and conclusions whether the plan unfairly shifts such failure risk.

e. *Unfair Discrimination*

■ Along with being "fair and equitable," Section 1129(b) requires that a cram-down plan not "unfairly discriminate" against an objecting impaired creditor. According to Friedman, this phrase means that creditors

who are similarly situated regarding legal rights and priority cannot be given unequal treatment under a plan of reorganization. Although the Code itself does not offer guidance regarding the application of the phrase, the legislative history does include the statement that the unfair discrimination test "demands that a class not be unfairly discriminated against with respect to equal classes." Friedman at 1502 n. 20. Furthermore, a description of the concept of discrimination that courts frequently cite is found in Collier on Bankruptcy, para. 1129.03(3)(b):

> Reducing "discrimination" to its bare essentials, a dissident class must not only receive "fair and equitable" treatment but the class must also receive treatment which allocates value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.

*Id.* at 1502 n. 20.

Aetna argues that the Plan discriminates against it unfairly because junior creditors will receive a rate of interest superior to Aetna's and will thereby be unfairly overcompensated. Under the Plan, Aetna receives approximately 7.5 percent interest during the first year—1.5 percent above prime—while every creditor junior to Aetna will receive approximately 8 percent interest, or 2 percent above prime.

Courts have taken different views on the interest rate issue. *In re Dilts,* 100 B.R. 759 (Bankr.W.D.Pa.1989), held it was unfair discrimination for a junior lienholder to receive a higher interest rate than that imposed on a senior lienholder on the same property. The reorganization plan would have impaired a senior secured claim by lowering its 14 percent interest rate to 10.5 percent and extending its repayment period, while leaving unimpaired a junior secured claim. The court held that such a plan was unfairly discriminatory, stating,

> We find no support in the Code for the proposition that the debtors may impair an oversecured creditor, [the senior lienholder], over its objections, by reducing the interest rate and extending the term of the repayment period while a junior mortgageholder on the same property is to receive

payment in full over an extended period at a higher interest rate than that proposed to the first mortgageholder.

*Id.* at 761.

In contrast, *In re Buttonwood Partners, Ltd.,* 111 B.R. 57 (S.D.N.Y.1990), approved a plan where the second lienholder received a slightly higher interest rate. That court applied a four-part inquiry for determining whether discrimination was fair, which required that: (1) there is a reasonable basis for discriminating; (2) the debtor cannot consummate the plan without discriminating; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is in direct proportion to its rationale. The *Buttonwood* court distinguished *Dilts* because both classes in *Buttonwood* were impaired, while the junior claimant in *Dilts* was not impaired, and because the senior claimholder in *Buttonwood* received a rate of interest that was a fair and reasonable reflection of the market rate. *Id.* at 63.

The court holds that, under the requirement that the plan not unfairly discriminate, the bankruptcy court must evaluate the interest structure of the plan, and make findings and conclusions whether and in what manner there is a reasonable basis for any discrimination, and the importance to the plan of such discrimination.

### 2. *The Bankruptcy Court's Application of the Requirements.*

■ The bankruptcy court's findings and conclusions and its order are sketchy in making the necessary evaluations.

In its Findings of Fact, the bankruptcy court finds in essence concerning section 1129(b) factors that Aetna's 7.5% plan interest rate is a "market" rate of interest, the plan's pre-sale requirement will result in a substantial loan principal balance reduction thereby reducing the loan's risk, Aetna will receive 95% of net sales proceeds further reducing the loan risk, the risks are no greater than construction and permanent loan risks, and "it is likely" Aetna's claim will be paid in full. The court concludes the plan "fully satisfies the requirements in Section 1129(b)," and "all creditors, including Aetna,

will receive at least as much under the Plan as they would receive in Chapter 7 liquidation." Specific Findings of Fact and Conclusions of Law, July 20, 1993.

At the same time, in its July 20, 1993, Order Confirming Debtor's ... Plan, the bankruptcy court found in essence concerning section 1129(b) factors that the plan was proposed in good faith, each claim holder has accepted the plan or will receive or retain property valued not less than the amount receivable under Chapter 7 liquidation, the plan is "feasible" and not likely to be followed by liquidation or need for further financial reorganization, and 11 U.S.C. § 1129(a) is fully complied with.

These findings are too vague and general to satisfy the strict rule of Section 1129(b). Since Aetna would not retain its same lien or its right to credit bid, the findings must specifically articulate how Aetna will receive the "indubitable equivalent" of its claim in satisfaction of the "fair and equitable" standard. As a further part of that formula, findings must specify whether Aetna will be paid in full before a junior class may share, and the compelling reason, if any, to depart from such absolute priority. Further, findings must specify whether there is a shift of plan failure risk to Aetna, and, if so, why that is not unfair. Finally, findings must evaluate the plan's interest structure, whether and in what manner there is a reasonable basis for discrimination, and the importance to the plan of such discrimination.

### III. *DISPOSITION*

The matter is REMANDED to the bankruptcy court for further hearing if the court deems it necessary, and for further findings.