**In re Michael R. SPARKS, Debtor.**

**Bankruptcy No. 92 B 21692.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 14, 1994.

David P. Leibowitz, Michael P. O'Neil, Freeborn & Peters, David A. Weininger, Chicago, IL, for debtor.

Michael L. Molinaro, Synde B. Keywell, Ferdinand J. Gallo, III, Katten Muchin & Zavis, Chicago, IL, for Metropolitan Life Ins. Co.

John V. Del Gaudio, Jr., Chicago, IL, for Official Committee of Unsecured Creditors.

Kathryn Gleason, Office of U.S. Trustee, Chicago, IL, for U.S. Trustee.

Paula K. Jacobi, Schwartz Cooper Greenberger & Krauss, Chicago, IL, for NBD Bank (Schiller Park Property).

Mark L. Prager, Ed Mason, Bradley S. Block, Foley & Lardner, Chicago, IL, for NBD Bank (Arlington Hgts. Property).

## *MEMORANDUM OPINION*

RONALD BARLIANT, Bankruptcy Judge.

### I.  INTRODUCTION

The Debtor, Michael R. Sparks, has been a broker, developer, and operator of real estate in the Chicago area since 1961. He has specialized in owning and operating apartment buildings with a focus on so-called "corporate suite" furnished apartments. Faced with various financial difficulties, Mr. Sparks filed a voluntary chapter 11 petition on September 29, 1992. Presently before the Court for rulings are the confirmation of the Debtor's Second Amended Plan of Reorganization dated June 11, 1993 (the "Plan") and the motion of Metropolitan Life Insurance Company ("MetLife") to modify the automatic stay.

The Debtor's Plan provides for the partial conversion of one of his properties from an apartment complex to a condominium project. For the reasons discussed below, the Court finds that the Plan is not "fair and equitable" because it does not provide the objecting secured creditor, MetLife, with the "indubitable equivalent" of its claim, as required by § 1129(b)(2)(A)(iii) [1] of the Bankruptcy Code (the "Code"). Therefore, confirmation will be denied. Further, the Court finds that the Debtor has no equity in the property in which MetLife has a security interest and, under the circumstances, the property is not necessary for an effective reorganization. Accordingly, MetLife's motion to modify the automatic stay will be granted.

---

1. Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code (the "Code"), 11 U.S.C. §§ 101–1330.

## II.  BACKGROUND

The Debtor has ownership interests in the following six parcels of real property in the suburbs of Chicago: Twelve Oaks/Arlington, Twelve Oaks/Northbrook, Barrington Hills Residential Subdivision, Residence Inn by Mariott–Schiller Park, Hidden Pond at Schaumburg Square, and Crescent Plum Tree Subdivision.  The Debtor is also the sole owner and president of Sparks & Associates, Inc. (the "Company"), a subchapter S corporation that manages some of these properties.  The dispute concerning the confirmation of the Debtor's Plan centers on the proposed partial conversion of Twelve Oaks/Arlington from apartments to condominiums.[2]

The Debtor holds 100% of the beneficial interest in a land trust, the corpus of which is thirty-four acres of real property located at 1130 South New Wilke Road, Arlington Heights, Illinois ("Twelve Oaks/Arlington"). LaSalle National Bank is the trustee of this land trust.  Twelve Oaks/Arlington consists of a 468–unit apartment complex (including 12 mid-rise elevator buildings, 181 one-bedroom units, and 287 two-bedroom units), two outdoor swimming pools, a clubhouse, jogging paths, 278 enclosed garage spaces, 496 surface parking spaces, and other amenities. The Debtor acquired his interest in Twelve Oaks/Arlington in 1977, but the apartment buildings and clubhouse are approximately twenty-six years old.  The Debtor rents some of the apartments at Twelve Oaks/Arlington on a long-term unfurnished basis and the rest on a short-term furnished basis. The Debtor and the objecting secured creditor, Metropolitan Life Insurance Company ("MetLife"), have stipulated that, for the purposes of confirmation, the value of Twelve Oaks/Arlington is $27 million.

In 1989, Mr. Sparks solicited a loan from MetLife.  On December 13, 1989, the parties executed a Note Secured by Mortgage in the amount of $27,500,000 (the "1989 Note").

The 1989 Note provided that interest would accrue at the rate of 9% per year.  The 1989 Note required Mr. Sparks to pay only interest on the loan until December 1, 1991, then to make interest and principal amortization payments of $224,483 per month until January 1, 1995, when the full balance of the loan would become due.  The 1989 Note was secured by Mr. Sparks's interest in Twelve Oaks/Arlington and by all leases, rents, revenues, income, receipts, issues, profits, and proceeds arising from and relating to Twelve Oaks/Arlington.

Mr. Sparks defaulted on the 1989 Note when he failed to pay approximately $3 million in real estate taxes for 1989 and 1990, which resulted in the imposition of a tax lien on Twelve Oaks/Arlington.  Mr. Sparks's delinquency in tax payments was precipitated by substantial securities losses he suffered in 1990 and 1991.[3]  On May 27, 1992, MetLife commenced foreclosure proceedings on Twelve Oaks/Arlington in state court.  The state court subsequently granted MetLife's petition for the appointment of a receiver, but the automatic stay imposed by Mr. Sparks's chapter 11 filing on September 29, 1992, prohibited the receiver from taking charge of the property.  § 362(a).  Instead, Mr. Sparks has continued to operate Twelve Oaks/Arlington as debtor-in-possession. §§ 1107(a) & 1108.

On January 13, 1993, with Court approval, the Debtor and MetLife executed a Note Secured by Mortgage (the "1993 Note") in the amount of $3,235,675.70 so that the Debtor could redeem his past due real estate taxes on Twelve Oaks/Arlington.  The 1993 Note was secured by a senior lien on the Debtor's interest in Twelve Oaks/Arlington and its proceeds.  § 364(d)(1).  On April 15, 1994, the Court authorized the Debtor to replace the outstanding balance of the 1993 Note with a new debtor-in-possession loan from NBD Bank (the "DIP Loan").  The DIP Loan is secured by a new senior lien on

---

2.  Accordingly, this memorandum opinion discusses only the Twelve Oaks/Arlington property. A separate unpublished memorandum, captioned "Supplemental Findings and Conclusions," details the Debtor's and various creditors' interests in the other properties.

3.  The Debtor alleges that he is the victim of securities fraud, and he is participating in a class action lawsuit in federal district court to recover damages.  No decision or settlement of that litigation has been reported to this Court.

the Debtor's interest in Twelve Oaks/Arlington and by the Debtor's personal guaranty. *Id.*

The Debtor and MetLife do not agree on the amount of MetLife's claim based upon the 1989 Note. MetLife asserts that the Debtor currently owes it more than $28 million, but the Debtor maintains that MetLife has improperly included "yield maintenance" of over $2 million as a part of its claim, so MetLife's claim based upon the 1989 Note is only approximately $26 million. In either case, however, MetLife's claim is undersecured because the collateral is worth $27 million (by stipulation) and NBD Bank possesses a senior lien for approximately $2.4 million (for the DIP Loan), leaving only approximately $24.6 million in value for MetLife's security interest (ignoring any possible senior liens on the property for allegedly unpaid real estate taxes).

## III. ANALYSIS

### A. Confirmation

#### 1. Terms of the Debtor's Plan

■ The Debtor's Plan, as modified,[4] establishes eighteen classes of claims and interests. Ten of these eighteen classes are impaired. For the purposes of this opinion, the significant classes are Class 2(b), which contains the secured portion of MetLife's claim, and Class 3(a)(1), which contains the unsecured portion of MetLife's claim.[5]

In his Plan, the Debtor proposes to pay MetLife 100% of its secured claim, with interest, according to the following terms: The Debtor's payments to MetLife will be due in forty-eight monthly installments, with a balloon payment of all unpaid interest and principal at the end of the forty-eight months.

The Debtor will make monthly interest payments based upon the "Distributable Cash Flow" generated by Twelve Oaks/Arlington, at a rate not to exceed 7.5%. Interest will accrue, however, at the fixed annual rate of either 9% or 395 basis points[6] above "the applicable two (2) year Treasury security," whichever is greater on the date of confirmation. The Debtor will repay the principal by giving MetLife 1/468 of its secured claim (approximately $53,000) for each condominium unit he sells. The Debtor may convert up to 50% of the apartments at Twelve Oaks/Arlington into condominium units. The Plan further requires MetLife to release its lien on each converted condominium unit as it is sold.

The Debtor also proposes to pay MetLife 100% of the unsecured portion of its claim, with interest at the rate of 2% over the Prime Rate, in seven annual payments. Indeed, the Plan treats all unsecured claims over $250 (except "Allowed Tenant Unsecured Claims") in the same manner.

Creditors in seven of the ten impaired classes cast ballots. A tally of these ballots shows that five of the seven impaired classes in which votes were cast accepted the Plan, but two impaired classes, Class 2(b) (containing the secured portion of MetLife's claim) and Class 3(a)(1) (containing the unsecured portion of MetLife's claim), rejected the Plan. Accordingly, the Debtor's Plan can be confirmed only if it meets the so-called cramdown standard contained in § 1129(b). *See* § 1129(b)(1) (providing that if a plan is not accepted by the impaired classes, then "the court ... shall confirm the plan ... if the plan does not discriminate unfairly, and is fair and equitable, with respect to each [impaired and rejecting class]").

---

4. The Debtor has filed five "modifications" to his Plan. MetLife moved to strike the Debtor's Fifth Modification on the ground that it was filed after the close of the confirmation hearing. Since the Court will deny confirmation of the Plan, it will also deny MetLife's motion as moot.

5. MetLife declined to make the so-called § 1111(b) election, which would have required the Debtor to treat MetLife's entire claim as secured. *See* § 1111(b)(2) ("If such an election is made, then ... such claim is a secured claim to the extent that such claim is allowed."). The Debtor's Fourth Modification to his Plan reclassi-

fied the unsecured portion of MetLife's claim separately from the other unsecured claims because MetLife's § 1111(b) deficiency claim is not "substantially similar" to the other unsecured claims. *See* § 1122(a) (providing that claims that are not "substantially similar" cannot be classified together); *In re Woodbrook Assocs.*, 19 F.3d 312, 319 (7th Cir.1994) (concluding that a § 1111(b) deficiency claim is not "substantially similar" to other unsecured claims).

6. A "basis point" is 1/100 of a percentage point.

## 2. "Fair and Equitable" Requirement

Paragraph (2) of § 1129(b) defines the "fair and equitable" aspect of the cramdown standard by type of claim or interest; subparagraph (A) sets forth the requirements if the claim is secured:

### § 1129. Confirmation of plan

\*    \*    \*    \*    \*    \*

(b)(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

\*    \*    \*    \*    \*    \*

A plan meets the "fair and equitable" requirement with respect to a secured claim, therefore, if it fulfills clause (i), (ii), or (iii) of § 1129(b)(2)(A). This Court will deny confirmation of the Debtor's Plan because it does not meet the requirements of any of these three clauses.

### a. § 1129(b)(2)(A)(i): Retention of Liens

■ Clause (i) is satisfied if the plan permits the secured creditor to retain its lien on the collateral and the secured creditor receives the present value of its claim over the course of the plan. *See, e.g., In re Monarch Beach Venture, Ltd.,* 166 B.R. 428, 433 (C.D.Cal.1993) ("First, 1129(b)(2)(A)(i), requires that the creditor retain the liens securing the claim, and receive deferred cash payments."). The Debtor's Plan does not meet the requirements of clause (i) because the Plan requires MetLife to release its lien on each converted condominium unit as it is sold.

### b. § 1129(b)(2)(A)(ii): Sale of Collateral and Payment of Proceeds

■ Likewise, the Debtor's Plan does not fulfill the requirements of clause (ii).

The second alternative, 1129(b)(2)(A)(ii), allows the sale of collateral free and clear of the creditor's lien, and is essentially a means of converting secured property into cash collateral. Under this alternative, the debtor may either pay the proceeds of a sale of collateral to the creditor or retain the proceeds subject to a lien, with the proceeds or their equivalent being distributed in some manner to the creditor. *Id.* The Plan requires the Debtor to pay MetLife only approximately $53,000 as each condominium unit is sold, but the Debtor projects that the sales prices of the condominiums will range from approximately $72,-000 to $90,000. The Debtor proposes to use the excess $19,000 to $37,000 in cash proceeds on each unit to finance the condominium conversion. This proposed use of proceeds, however, violates clause (ii), which requires the debtor to pay 100% of the proceeds to the secured creditor or for the secured creditor to retain a lien on these proceeds. Therefore, the Debtor's Plan does not comply with clause (ii). Instead, the Court's decision on confirmation of the Plan turns on its finding of fact concerning clause (iii) and the definition of "indubitable equivalent." [7] *See In re James Wilson Assocs.,* 965

---

7. MetLife has objected to the confirmation of the Plan on several other grounds as well. However, because confirmation will be denied based upon the Court's finding of the Plan's failure to pro-

F.2d 160, 172 (7th Cir.1992) ("the question whether the interest received by a secured creditor under a plan of reorganization is the indubitable equivalent of his lien is one of fact").

### c. § 1129(b)(2)(A)(iii): "Indubitable Equivalent"

#### (1) Criteria

■ The Debtor presented extensive evidence in support of his contention that the Plan is "fair and equitable" because it provides MetLife with the "indubitable equivalent" of its claim, in satisfaction of clause (iii) of § 1129(b)(2)(A). The Court has evaluated the Debtor's and MetLife's evidence on this issue and finds that the Plan will not allow MetLife to realize the "indubitable equivalent" of its claim.

■ The phrase "indubitable equivalent" was coined by Judge Learned Hand in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935). *E.g.*, Jack Friedman, *What Courts Do To Secured Creditors in Chapter 11 Cram Down*, 14 Cardozo L.Rev. 1495, 1532 (1993). Judge Hand wrote:

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior

holders, unless by a substitute of the most indubitable equivalence.

*Murel*, 75 F.2d at 942. So indubitable equivalence requires more than the payment of interest; it requires the protection of the creditor's rights "to get his money or at least the property." The phrase "indubitable equivalent" appears twice in the Code; once in § 1129(b)(2)(A)(iii), the clause applicable to the instant case, and once in § 361(3), as part of the definition of "adequate protection."[8]

In the context of the "fair and equitable" standard, courts have explained that a particular plan meets the "indubitable equivalent" requirement if the plan "(1) provides the creditor with the present value of its claim, and (2) insures the safety of its principle [sic]." *E.g., Monarch Beach*, 166 B.R. at 434. Said another way, "a court must examine (1) whether the substituted security is completely compensatory and (2) the likelihood that the secured creditor will be paid." *In re San Filipe @ Voss, Ltd.*, 115 B.R. 526, 529 (S.D.Tex.1990).

■ Two attributes of the substituted collateral, its *value* and the degree of *risk* that it imposes on the secured creditor, determine whether the new collateral is sufficiently "safe" and "completely compensatory."[9] New collateral with a value less than the value of the original collateral cannot be "completely compensatory." Similarly, new collateral with a value projected to be equal to, or even more than, the original collateral is not "completely compensatory" if the new collateral is so much riskier than the original collateral that there is a substantially greater likelihood that the secured creditor will not be paid.[10]

---

vide MetLife with the "indubitable equivalent" of its claim, the Court need not rule on the other grounds of MetLife's objection.

**8.** Section 361(3) provides as follows:

§ 361. **Adequate protection**
When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

\*     \*     \*     \*     \*     \*

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the real-

ization by such entity of the indubitable equivalent of such entity's interest in such property.

**9.** Borrowing from the discipline of statistics, these attributes are roughly analogous to the concepts of "expected value" and "variance."

**10.** Although the factual setting is somewhat different from the instant case, the Seventh Circuit's decision in *James Wilson* illustrates the interrelationship between value and risk in the context of an "indubitable equivalent" analysis:

> It might appear that if the security is worth much more than the loan (almost twice as much here), the risk of default will be negligible and the interest bonus was therefore super-

Applying the "indubitable equivalent" standard to the instant case, the Court finds that the value of Twelve Oaks/Arlington after its partial conversion to a condominium project is probably equal to or greater than its value as an apartment complex. The risk that such a conversion would impose upon MetLife, however, is significantly greater than the risk that MetLife faces with Twelve Oaks/Arlington in its present incarnation as an apartment complex.

### (2) Findings of Fact

That risk is demonstrated by much of the evidence. It was summarized by MetLife's asset recovery team leader, Mr. Yurinich, when he described the major changes the plan proposed to make in MetLife's rights. An apartment project has a known income stream, based on existing leases and a historical record. A condominium project has an income stream that depends on day-to-day sales that cannot be as confidently predicted. The conversion would also introduce new entities into the relationship between MetLife and the Debtor. There would be unit owners and a condominium association, which would own the extensive grounds free of MetLife's lien. Although the Debtor argues that MetLife would have ways to deal with those interests, it is clear that MetLife's right to foreclose its mortgage would be complicated by the need to deal with the new entities and ownership structure. As one of MetLife's experts, Mr. Kim, said, there is a difference between having a lien on a fee simple title and having a collection of rights.

The evidence also demonstrates the financial risks. Success of the plan depends upon the rate at which condominium units could be sold, the income from the unconverted south half, the amount of the expenses that must be paid from the income stream, and the Debtor's ability to sell or refinance the project when the balloon payment falls due. There was considerable testimony concerning these factors. On balance, that evidence demonstrates that the condominium project would have a reasonable chance of success. Indeed, it would not be unreasonable to invest in such a project.

■ The problem is that the Debtor is not proposing to invest in such a project. He is proposing that MetLife be forced to invest in such a project, and to accept that investment in lieu of its present rights as a secured creditor. In order to achieve that end the Debtor had to prove, not merely that the risk is reasonable, but that the risk to MetLife would not be increased by reason of the change in its collateral. The Debtor has not satisfied that burden.

The first financial problem with the plan is that, on the Debtor's own projections, the MetLife claim will increase in the early months of the project. The Debtor will not be able to pay interest, so the mortgage will be negatively amortized. MetLife will therefore lose the time value of its money, which will then become additional indebtedness to be paid from future proceeds. That in itself would not be a serious problem if the prospect of adequate future proceeds were reasonably certain, but they are not.

Most of the evidence concerning projections of cash flow centered on three areas: the rate at which condominium units would be sold, referred to by the witnesses as the absorption rate; expected income from the rental units remaining after conversion of the north half; and the cost of deferred maintenance in the south half. On all these issues, MetLife introduced evidence that contradicted the Debtor's optimism.

The Debtor's evidence that the condominium units would be absorbed by the market in eighteen months was credible, but principally based on the subjective judgements of experienced experts, rather than serious market studies. To the extent that one of the Debtor's experts, Mr. Lieberman, relied on market comparables, they were in important re-

fluous. But the appearance is misleading. The risk of default may be great. The borrower may use the difference between the value of the security and the loan secured by it to secure other loans. Nor is the risk of default a costless one to the secured creditor merely because his lien is oversecured. More impor- tant than the expenses of foreclosure (should there be a default) is the possibility that the security will decline in value over the life of the loan, here seven years, to the point where it is no longer adequate.

*James Wilson,* 965 F.2d at 172 (parentheses in original).

spects different from Twelve Oaks/Arlington. Unlike some of the comparables, Twelve Oaks/Arlington was not constructed as a condominium project and is relatively old. And, of course, there are location differences.

The Debtor's experts were rebutted by a MetLife expert whose opinion that absorption would require as much as forty-eight months was similarly based on subjective judgment informed by substantial experience. His attempt to buttress his judgment with a purported statistical analysis was singularly unsuccessful. Nevertheless, MetLife did succeed in showing that there is a material risk that the Debtor's projected absorption rate could not be met, meaning that there is a material risk that his cash flow projections would prove to be inaccurate.

From MetLife's point of view, the evidence regarding the cost of deferred maintenance, repairs and replacements was even more compelling. MetLife's witness, Mr. Lehn, credibly demonstrated that in several areas the Debtor is likely under-estimating costs. (Even the Debtor's own "Rehab Master Improvement Budget" includes an expense of $150,000 for "boiler rehab reserve," but this item is not reflected in the Debtor's cash flow projections.) Although the Debtor increased its budget for work on the north half, there is a significant risk that he will need to spend as much as a $1,000,000 more than he has projected on the south half of the property. That, in turn, creates a risk that the Debtor will not be able to make the payments contemplated by the plan, and MetLife will be faced with the foreclosure of a failed condominium conversion project, rather than a fully-occupied apartment complex.

Finally, the Debtor has projected a steady growth in net rental income for the south portion of the complex. MetLife, using historical averages, has a less optimistic forecast. Indeed, the parties projections of rental income for 1998 differ by about $800,000. There are reasons to question the Debtor's projections. They contain arithmetic errors. There were changes over time in different versions of the Debtor's projections that have not been adequately explained. Further, the significant differences between the Debtor's projections and MetLife's projections based

on historical averages demonstrate, at the least, the risk that the Debtor will not be able to achieve the operating income necessary to make contemplated payments and achieve the refinancing or sale at an amount necessary to make the balloon payment. Again, it is that risk, rather than the "reasonableness" of the projections, that is relevant to the conclusion that the plan does not provide for the realization of the indubitable equivalent of MetLife's claim.

Taken as a whole, the evidence reveals that the proposed partial conversion of Twelve Oaks/Arlington to a condominium project exposes MetLife to risks significantly greater than those it now must bear. It is likely that the property is more valuable as a condominium project than a pure rental complex, but there is also a significant chance that the proposed conversion will fail.

For these reasons, the Debtor's Plan does not provide MetLife with the "indubitable equivalent" of its claim. Consequently, the Plan is not "fair and equitable" with respect to MetLife's claim, and the Court cannot confirm the Plan.

**B. Automatic Stay**

██ In addition to objecting to the confirmation of the Debtor's Plan, MetLife also moved for the entry of an order modifying the automatic stay with respect to Twelve Oaks/Arlington so that it could proceed with its state court foreclosure action. MetLife asserts that it is entitled to this relief pursuant to § 362(d)(2), which provides as follows:

**11 U.S.C. § 362. Automatic Stay**

\* \* \* \* \* \*

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

\* \* \* \* \* \*

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

\* \* \* \* \* \*

The Debtor clearly has no equity in Twelve Oaks/Arlington; the issue is whether the property is "necessary to an effective reorganization."

In *United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), the Supreme Court elaborated on the meaning of § 362(d)(2)(B):

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."

*Id.* at 375–76, 108 S.Ct. at 632 (emphasis in original). The Debtor's "effective reorganization" of Twelve Oaks/Arlington is not "in prospect" because his proposed plan cannot be confirmed and there is no readily apparent alternative that can be proposed and confirmed within a reasonable time. Therefore, both subparagraphs of § 362(d)(2) are satisfied, and MetLife is entitled to a modification of the automatic stay with respect to Twelve Oaks/Arlington so that it may pursue its remedies in state court.

## IV. CONCLUSION

Two impaired classes rejected the Debtor's Plan, so the Plan cannot be confirmed unless it satisfies the so-called cramdown standard, including the requirement that the Plan be "fair and equitable" with respect to each rejecting impaired class. The Plan calls for a conversion of half of the Debtor's Twelve Oaks/Arlington apartment complex into condominiums. This proposed action, however, is not "fair and equitable" with respect to the class containing MetLife's secured claim because it would deny MetLife the "indubitable equivalent" of its claim. Therefore, the Court will deny confirmation of the Plan. Further, the Court will modify the automatic stay with respect to Twelve Oaks/Arlington because the Debtor has no equity in the property and it is not necessary for an effective reorganization. An appropriate order will be entered.

### ORDER

For the reasons stated in the Memorandum Opinion of even date, **IT IS HEREBY ORDERED THAT:**

1. Confirmation of the Debtor's Second Amended Plan of Reorganization Dated June 11, 1993, as modified, is **DENIED**.

2. The Motion of Metropolitan Life Insurance Company to Strike the Fifth Modification to the Debtor's Second Amended Plan is **DENIED** as moot.

3. The Motion of Metropolitan Life Insurance Company for Relief from the Automatic Stay with respect to the property commonly known as Twelve Oaks/Arlington is **GRANTED**.